**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**GENE TANNEY, #201795,**

                    **Plaintiff(s),**          **CASE NUMBER: 04-71260**
                                               **HONORABLE VICTORIA A. ROBERTS**

**v.**

**KANDIS BOLES,**

                    **Defendant(s).**
_____/

**ORDER**

## I.    INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. # 44)and Defendant Boles' Motion to Dismiss and for Summary Judgment (Doc. #45). Plaintiff's motion is **DENIED**.  Defendant's Motion for Summary Judgement is **DENIED** and Defendant's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.  The Plaintiff is allowed to amend his complaint to clarify the capacities under which Defendant is sued and the forms of relief requested.

## II.   BACKGROUND

Plaintiff Gene Tanney is currently an inmate at the Federal Correctional Institution Milan in Milan, Michigan.  His complaint stems from alleged acts and omissions by Defendant Kandis Boles, who was his Case Manager at the facility where he was previously housed, the Charles Egeler Reception and Guidance Center

1

("Egeler"), in Jackson, Michigan.[1]  Egeler is part of the Michigan Department of Corrections ("MDOC").

Plaintiff is deaf.  He is unable to hear or speak.  He uses American Sign Language to communicate, and he can only use the telephone through a Telecommunication Device for the Deaf (commonly referred to as "TDD" or "TTY"; hereinafter "TDD/TTY").  Plaintiff was housed in 2 Block North at Egeler in March and April of 2003.  During that time, Plaintiff alleges that he was not given access to TDD/TTY with the same regularity that was afforded non-hearing impaired prisoners who were able to use the regular prison telephone system.

The prison telephone system, which is used by hearing prisoners, has a number of automated restrictions.  Those restrictions include, *inter alia*, that all calls are recorded (except those to attorneys) and can be monitored in real time.  The TDD/TTY device at Egeler was not connected to the same telephone system used for hearing prisoners.  Instead, the TDD/TTY was used with a staff telephone line that was not subject to the same automated monitoring and recording restrictions as the hearing prisoners' telephone system.  And, Plaintiff had to type his answers to an operator who relayed his statements orally to the listener and typed the listener's response to Plaintiff.  Consequently, each time Plaintiff wished to use the TDD/TTY, a staff person had to sit with him for the duration of the call, and the TDD/TTY system would print out the conversation that was typed into and received by the TDD/TTY machine.

---

[1]Plaintiff initially filed his complaint *pro se*, and he also named Egeler Warden Nick Ludwick and Resident Unit Manager William Denman.  However, after Plaintiff was appointed counsel, he filed an Amended Complaint and he only named Boles.

Before using the phones, all prisoners (including hearing impaired prisoners) are required to complete a MDOC Telephone Agreement and Number List ("Number List"), which they use to identify the name and telephone number of up to 20 persons whom they want authorization to call.  The Number List is then given to a Case Manager to approve.  Approval simply consists of the Case Manager confirming the identity of the persons designated as attorneys.  Once an inmate's Number List is approved, it is given to the prison's telephone carrier which assigns a prisoner identification number.  The inmate, thereafter, must use the identification number when making calls and is only allowed to call numbers on the Number List.

Hearing prisoners were given access to telephones daily; 15 minutes to speak with family and friends and 20 minutes to speak with an attorney.  There was a bank of four phones in Plaintiff's housing unit, referred to as the "housing unit phones," that were available via a sign-up system for approximately three to four hours each day.  At dinner, inmates who wished to use the housing unit phones the following day were required to sign up for morning and evening twenty-minute time slots.  Hearing prisoners could also use a bank of twelve phones located in the prison yard during "yard time," which lasted for one and one-half hours each day.  Per Defendant, the housing unit and yard phones were shared by approximately 160 prisoners.  Nevertheless, because some prisoners used the phones infrequently, Officer William Moore testified that prisoners who wanted to could use the phones almost daily.[2]

---

[2]Moore presumably was an officer who worked at Egeler during Plaintiff's incarceration.  However, the parties do not indicate his title or the capacity in which he worked.

3

There was only one TDD/TTY telephone in 2 Block and it was kept locked in Defendant Boles' office.  Other than the general policies regarding prison telephone use, there were no written policies or procedures directing staff on how or when inmates were to be given access to the TDD/TTY, except that Plaintiff was given 30 minutes since he had to communicate by typing.

Boles was Plaintiff's Case Manager from the time he arrived in March until April 21, 2003, when he was transferred to another block.  On approximately March 20, 2003, Plaintiff completed a Number List and turned it in to Boles for review and approval. Boles approved Plaintiff's list and it was returned to him sometime between March 26 and April 1, 2003.  Between April 1st and the 13th, Plaintiff says that he was only allowed to use the phone five times, although he made numerous requests.[3]  Because the TDD/TTY was in Boles' office, he says that he asked her on a number of occasions but that she sometimes refused to speak with him.  When unable to communicate with Boles, he asked other officers.  However, Plaintiff says that his requests were often denied because the officers said that they either did not have a key to Boles' office or they did not have permission to let Plaintiff use the TDD/TTY.  He also contends that no one wanted to supervise his calls.

Officer Moore testified that Plaintiff would often request to use the phone at times other than was allowed for the general population.  Rather than signing up for use at the times specified for hearing prisoners, Moore says Plaintiff would make his request by

---

[3]Plaintiff actually asserts that he was only allowed to use it on three occasions. However, Defendant says he used it five times--April 1, 2, 5, 11 and 13.  For purposes of this motion only, Plaintiff accepts Defendant's assertion.

4

giving a note to an officer.  However, Moore further acknowledged that Plaintiff's requests were subject to the availability of staff even when he made them during designated times:

> Q:    And you mentioned that prisoners are allowed to use the phone during yard time.  Was Gene Tanney able to use the phone during yard time?
>
> A:    It would depend on if he could catch the -- like a counselor or a sergeant or something to give him access to the phone.

Moore Dep. at p. 28.

A problem arose when, on one of the occasions Plaintiff was allowed to use the phone, he called a cell phone.  There was no written policy explicitly precluding calls by hearing or hearing-impaired prisoners to cell phones, and Plaintiff says that he was never told that such calls were prohibited.  Apparently, prison officials relied on the fact that the phones available to hearing prisoners automatically blocked calls to cell phones.  But, the phone line to which the TDD/TTY phone was attached was not equipped to do so and the number Plaintiff called was on his approved list.  However, Defendant says Case Managers who approve Number Lists do not have the means to distinguish cell phone numbers from those assigned to land lines.  And, despite the lack of an explicit policy banning calls to cell phones, Defendant asserts that there was a written policy against the use of so-called "burnout phones," which the MDOC defines as "[p]hone service which has been installed and for which there is no intent to pay for the installation or other charges."  Def. Exh. K, p.2.  Warden Ludwick states that his interpretation of this policy is that cell phones are regarded as burnout phones.  However, Ludwick admits that his interpretation was not written, and there is no

5

evidence that Plaintiff was ever made aware of it.

Plaintiff made the cell phone call on Saturday, April 5th.  Boles was not working on that day because she did not typically work weekends.  She found out about the call on April 7th after reading a transcript.  She then sent a memo to Inspector DeWayne Burton asking whether Plaintiff's call was grounds for a telephone restriction.[4]   On April 11th, Boles sent Inspector Burton another e-mail asking for a response to her question, because Plaintiff was asking to use the telephone again.  Inspector Burton did not respond until April 14th, saying that he would probably restrict Plaintiff's phone use.  However, he noted that the call would have been blocked if Plaintiff were an "ordinary inmate."

On April 16th, Boles sent an e-mail to her immediate supervisor, Resident Unit Manager William Denman, indicating that Plaintiff made an unauthorized call the prior Sunday (which presumably was April 13th).  The e-mail does not clearly indicate why the call was unauthorized.  However, based on the Sunday call, Boles requested permission to deny Plaintiff any further calls until she got an official response from Inspector Burton.  Denman granted Boles' request.  The next day, Boles issued a Notice of Intent to Conduct an Administrative Hearing Report ("NOI") against Plaintiff for his cell phone call on April 5th.  His phone privileges were immediately restricted pending a hearing on the NOI.[5]  MDOC Policy Directive 05.03.130 (GG) required that the hearing be held within 14 business days of the restriction.  Plaintiff never had a hearing,

---

[4]Per Plaintiff, Inspector Burton was in charge of compliance with phone policies.

[5]Even when an inmate's calls are restricted. MDOC Policy Directive 05.03.130 (HH) permits inmates to make calls to an attorney or legal service organization.

6

however, because he was transferred out of the 2 Block on April 21st, and out of Egeler a short time later.  The NOI at Egeler was not used to restrict Plaintiff's phone use after his transfer.

On April 18, 2003, Plaintiff filed a grievance against Boles complaining about his inadequate telephone access.  Plaintiff pursued the grievance through one complete round of the grievance process , *i.e.*, through Steps I through III.  It was denied at each step.  In his denial at Step I, Denman stated that Plaintiff was allowed to use the TDD/TTY "when staff was available to supervise (at least 4 occasions)."  Pl. Exh. N.  At Step II, Warden Nick Ludwick also stated that "the TTY phone was available to the [Plaintiff] upon request and staff availability."  Pl. Exh. P.

In his Amended Complaint, Plaintiff alleges six counts: Count I--deprivation of civil rights (due process) in violation of 42 U.S.C. §1983; Count II---deprivation of civil rights (free speech) in violation of 42 U.S.C. §1983; Count III--violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12132; Count IV--violation of section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. §794; Count V--violation of Article I §5 of the Michigan Constitution (free speech); Count VI--violation of Article I §17 of the Michigan Constitution (fair and just treatment); and, Count VII[6]--violation of the Michigan Handicappers' Civil Rights Act ("HCRA").  The parties stipulated to the dismissal of the state law claims in Counts V through VII.  *See* Order, January 11, 2005.  Therefore, the parties' motions are directed at the remaining claims in Counts I through IV.

Plaintiff moves for summary judgment on Counts II through IV.  Defendant moves

---

[6]This Count is incorrectly numbered as VI in the Amended Civil Complaint.

for dismissal and/or summary judgment on Counts I through IV.

## III.   STANDARD OF REVIEW

Plaintiff's motion is filed pursuant to FRCP 56(c).  The Defendant's motions are brought under FRCP 12(b)(6) and 56(c).  Where the district court considers affidavits and exhibits attached to a motion to dismiss under FRCP 12(b)(6), the motion is converted to one seeking summary judgment under FRCP 56.  *Mitchell v. Chapman*, 343 F.3d 811, 818 (6th Cir. 2003).

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).  A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995).  To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c).  *Cox*, 53 F.3d at 149.  Alternatively, the movant may meet this burden by pointing

8

out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. Rule 56(e); *Cox*, 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland*, 57 F.3d at 479. The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV.   APPLICABLE LAW AND ANALYSIS

### A.   DEFENDANT WAS ON NOTICE THAT PLAINTIFF'S CLAIMS WERE ALLEGED AGAINST HER IN HER INDIVIDUAL AND OFFICIAL CAPACITY

In his *pro se* complaint, Plaintiff expressly brought suit against Defendant in both her individual and official capacities. Plaintiff later was appointed counsel and filed an amended complaint. In the amended complaint, however, Defendant contends that Plaintiff only asserted claims against Defendant in her official capacity:

> Upon information and belief, Defendant Kandis Boles ("Boles") is a Michigan resident. At all times relevant to this action, Ms. Boles was

9

> an Assistant Resident Unit Supervisor (hereafter "ARUS") at Egler
> [sic], and as such, *was acting in her official capacity*, and under color
> of state law.

Amended Complaint at ¶7 (emphasis added).  Consequently, Defendant moves to

dismiss Plaintiff's claims under 42 U.S.C. §1983[7] in Counts I and II.  She argues that

§1983 claims may not be brought against a state official in her official capacity for

monetary damages, and that Plaintiff's claim for injunctive relief is moot.  *See Will v*

*Michigan Department of State Police,* 491 U.S. 58, 71 (1989)("[N]either a State nor its

officials acting in their official capacities are "persons" under §1983.").  Plaintiff denies

that the language in paragraph 7 of his amended complaint indicates that he is only

suing Defendant in her official capacity.  He further contends that Defendant was aware

that she was sued in both her individual and official capacities, and he requests leave to

amend to clarify his pleadings.

"Absent a clear notification that defendants are being sued in their individual

capacities, courts must assume that they are being sued in their official capacities,

only."  *U.S. ex rel Diop v Wayne County Community College Dist.,* 242 F.Supp. 2d 497,

517 (E.D. Mich. 2003).  However, this presumption does not apply if the "course of

proceedings" indicates that a defendant was otherwise on notice that she was sued in

both capacities.  *Moore v City of Harriman,* 272 F.3d 769, 772 (6th Cir. 2001).  "The

---

[7]42 U.S.C. § 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State . . . subjects, or causes to be
> subjected, any citizen . . . the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or other proper
> proceeding for redress.

"course of proceedings" test considers such factors as the nature of the plaintiff's claims, requests for compensatory or punitive damages, and the nature of any defenses raised in response to the complaint, particularly claims of qualified immunity, to determine whether the defendant had actual knowledge of the potential for individual liability."  *Id* at 772 n. 1.  A court may also consider "whether subsequent pleadings put the defendant on notice of the capacity in which he or she is sued."  *Id.*

For example, in *Moore*, the Court considered the complaint and subsequent pleadings and found that defendants were sufficiently on notice that plaintiff's 42 U.S.C. §1983 claims were brought against them in their individual capacities, because: 1) in the caption, plaintiff listed only the officers' names, rather than their official titles; 2) defendants were referred to throughout the complaint as the "individual defendants;" 3) plaintiff asserted that defendants were acting for themselves as well as the City and that they acted with malice and violated his civil rights; 4) plaintiff requested compensatory and punitive damages; and 5) in response to defendants' Motion to Dismiss, plaintiff explicitly stated that the defendants were being sued in their individual capacities.

In contrast, in *Shepherd v Wellman*, 313 F.3d 963, 968-969 (6th Cir 2002), the Court found that the course of proceedings did not indicate that defendant was on notice that the claims were asserted against him in his individual capacity, even though plaintiffs requested monetary damages, because: 1) plaintiffs did not state the capacity in which defendant was sued in either the original or amended complaint; 2) plaintiffs' allegations were framed in terms of defendant's responsibilities in his supervisory capacity; and 3) there were no subsequent pleadings to clarify the question.

11

This case is not completely parallel with either *Moore* or *Shepherd.* Plaintiff does not indicate the capacity in which Defendant is sued in the caption of the amended complaint. But, he lists Defendant by name, rather than title. He states in paragraph 7 that Defendant was acting in her official capacity and under color of state law, but he does not otherwise frame his allegations only in terms of Plaintiff's official duties. Rather, he asserts that Defendant intentionally discriminated against him and ignored his assertions that his rights were being violated, and he requests compensatory and punitive damages. *See* Amended Civil Complaint at ¶¶ 21, 55, 62 and (C). There are no other pleadings which clarify Plaintiff's intent, except for his assertion in response to Defendant's motion that he sued her in her individual and official capacities. However, Defendant's assertion of qualified immunity in her affirmative defenses suggests that she was of the impression that she was being sued in her individual capacity. Def. Affirmative Defenses at ¶1. And, most significantly, in the original complaint, Plaintiff explicitly stated that Defendant was sued in her individual capacity for money damages and in her official capacity for injunctive and declaratory relief. *See* Complaint at ¶6.

Considering Plaintiff's original complaint, the substance of the allegations in the amended complaint, the relief sought, and Defendant's affirmative defenses, the Court finds that there is sufficient evidence that Defendant was on notice that she was sued in both her individual and official capacities. Further, Plaintiff explicitly stated at ¶6 of his original complaint that the Defendant was being sued for injunctive and declaratory relief in her official capacity and for monetary relief in her individual capacity. Accordingly, the Defendant is on notice of the particular relief sought.

Under the authority of FRCP 15(a), the Court will permit Plaintiff to amend his

12

complaint to explicitly state as much.  FRCP 15(a) states that leave to amend "shall be freely given when justice so requires."  "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits[,]" unless there is undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or amendment would be futile.  *Foman v Davis*, 371 U.S. 178, 182 (1962).  "Delay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted."  *Head v Jellico Housing Authority*, 870 F.2d 1117, 1123 (1989).  Defendant points out that the parties are approaching the scheduled trial date.  However, she does not assert that she will be substantially prejudiced if Plaintiff is allowed to amend his complaint to clarify the capacity in which Defendant is being sued.  Defendant also does not allege that any of the other factors that mitigate against allowing an amendment are present in this case.

Therefore, because the Defendant was on notice that she was being sued in both capacities, Plaintiff is allowed to amend and clarify his complaint.

**B.    PLAINTIFF'S CLAIMS IN COUNTS I AND II FOR MONETARY INJUNCTIVE AND DECLARATORY RELIEF MUST BE DISMISSED IN PART**

As stated, Defendant argues that §1983 claims for monetary damages may not be brought against government actors in their official capacity.  *See Will,* 491 U.S. at 71. Therefore, Defendant moves to dismiss Plaintiff's claims in Counts I and II that his

13

Fourteenth Amendment due process and First Amendment free speech rights were denied in violation of 42 U.S.C. §1983, to the extent the claims are brought against her in her official capacity for money damages.

Defendant concedes that §1983 claims may be brought against a government official in her official capacity when prospective injunctive relief is sought. *Id* at 71 n. 10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under §1983 because 'official-capacity actions for prospective relief are not treated as actions against the state."). However, Defendant asserts that Plaintiff's claim for injunctive relief is moot because he was transferred from Egeler (a state facility) on April 23, 2003. And, after being paroled in January 2005, he was removed from the state system altogether and placed in the federal system at Milan on a separate federal conviction. Therefore, to the extent that the claim for injunctive relief is only brought against Defendant in her official capacity, she contends that it should be dismissed as a matter of law.

Plaintiff does not dispute that *Will* precludes official capacity §1983 claims for monetary damages, and he concedes that his claim for injunctive relief is moot. However, he asserts that the monetary damage claim sought against Defendant in her individual capacity, and his individual and official capacity requests for declaratory relief, *i.e.*, that Defendant violated his rights under the First and Fourteenth Amendment, are viable. Defendant did not respond to this argument.

Plaintiff is correct that individual capacity §1983 claims for monetary damages and individual and official capacity claims for declaratory relief are not barred by the

14

Eleventh Amendment.[8]  However, the Court finds that Plaintiff's claim for declaratory

relief is moot.  The Sixth Circuit has consistently found that, like a claim for injunctive

relief, an inmate's claim for declaratory relief based on prison conditions or treatment

becomes moot once the inmate is transferred or released.[9]  Here, Plaintiff was

transferred from Egeler in April 2003 and he was subsequently removed from the state

penal system altogether.  Therefore, Plaintiff does not have a cognizable claim for

declaratory relief.

Thus, the Court grants Defendant's motion to dismiss Counts I and II to the

extent that Plaintiff seeks monetary relief against Defendant in her official capacity, and

injunctive and declaratory relief against Defendant in her individual and official

capacities.  However, the Court finds that Plaintiff's claims in Counts I and II  for

monetary damages against Defendant in her individual capacity are not barred by the

---

[8]*See Will,* 491 U.S. at 71; *Foulks v Ohio Department of Rehabilitation & Correction,* 713 F.2d 1229, 1233 (6th Cir. 1999)(Eleventh Amendment does not bar actions for money damages against state officials in their individual capacity); *Doe v Wiggington,* 21 F.3d 733, 737 (6th Cir. 1994)(official capacity claims for declaratory relief not barred by Eleventh Amendment); *Flagner v Wilkenson,* 241 F.3d 475, 483 (6th Cir. 2001)(claim for declaratory relief against government official in individual capacity allowed); *Bennett v Lopeman*, 598 F.Supp. 774, 779 (N.D. Ohio 1984)(Eleventh Amendment does not bar suits for declaratory relief against officials in their individual capacity).

[9]*See Lavado v Keohane,* 992 F.2d 601, 605 (6th Cir. 1993)(request for declaration that plaintiff's constitutional rights were violated by the way prison officials handled his mail became moot once plaintiff was released from prison); *Kensu v Haigh,* 87 F.3d 172 (6th Cir. 1996)(same); *Cox v O'Brien*, 770 F.2d 165, *2 (6th Cir. 1985)(request for declaratory relief regarding alleged interference with mail sent and received by inmate moot because he transferred to a different federal institution)(unpub. op.).  *See also Green v Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997)("Since [plaintiff] is no longer a prisoner . . . , the entry of a declaratory judgment in [his] favor would amount to nothing more than a declaration that he was wronged, and would have no effect on the defendants' behavior towards him.")(*citing Lavado, supra*).

15

Eleventh Amendment and may not be dismissed on this ground.

### C.     COUNT I WILL BE DISMISSED AS A MATTER OF LAW

In Count I of his amended complaint, Plaintiff alleges that his Fourteenth
Amendment due process rights were violated because a telephone restriction was
imposed upon him for violation of a non-existent cell phone rule, and because
Defendant failed to give him a hearing on the alleged violation in accordance with
MDOC Policy Directive 05.03.130.[10]  However, in his responsive brief, Plaintiff states
that his claim actually is that "it violates due process to take away privileges based on a
non-existent policy."   Pl. Resp. br. at p. 6.  He says that his claim is not based on the
MDOC hearing procedures.

Plaintiff does not expressly indicate in either his amended complaint or
responsive pleadings whether he is asserting a substantive or procedural due process
violation.  Regardless, he has not stated a claim for either type of claim that can survive
a motion to dismiss.

"[A] procedural due process analysis addresses two questions. '[T]he first asks
whether there exists a liberty or property interest which has been interfered with by the
State, the second examines whether the procedures attendant upon that deprivation
were constitutionally sufficient.'" *Bazzetta v McGinnis,* 423 F.3d 557, 563 (6th Cir. Sept.
13, 2005)(*quoting Kentucky Department of Corrections, v Thompson*, 490 U.S. 454, 460
(1989).  Plaintiff bases his claim on the alleged interference with his liberty interest. The

---

[10]The Fourteenth Amendment prohibits states from "depriv[ing] any person of life,
liberty, or property, without due process of law...." U.S. CONST. amend. XIV, § 1.

Supreme Court held that a disciplinary regulation does not implicate a liberty interest unless it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v Conner,* 515 U.S. 472, 484 (1995).  Unlike his claim in Count II that his First Amendment rights were violated by a lack of reasonable access to the TDD/TTY in general (which is discussed below), his claim in Count I is limited to the temporary telephone restriction imposed by Defendant via the NOI.   However, an inmate's loss or restriction of telephone privileges for disciplinary reasons is not considered an "atypical and significant hardship" (even when the disciplinary charges are allegedly false) and, therefore, does not implicate a liberty interest under the Fourteenth Amendment. *See Baskerville v Blot*, 224 F.Supp.2d 723, 736-737 (S.D. N.Y. 2002); *Husbands v McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y. 1998); *Warren v Irvin*, 985 F.Supp. 350, 353-354 (W.D.N.Y. 1997).  Plaintiff also has not presented any evidence that the procedures by which the restriction was imposed were constitutionally deficient.  Consequently, Plaintiff has not alleged a violation of procedural due process.

The Sixth Circuit recognizes two types of substantive due process claims: "(1) deprivation of a particular constitutional guarantee and (2) actions that 'government officials may not take no matter what procedural protections accompany them,' alternatively known as actions that 'shock the conscience.'" *Braley v City of Pontiac*, 906 F.2d 220, 225 (6th Cir. 1990).  The first type includes "claims asserting denial of a right, privilege, or immunity secured by the Constitution or by federal statute."  *Mertik v Blalock,* 983 F.2d 1353, 1367 (6th Cir. 1993).  The fact that Plaintiff's phone privileges

17

were temporarily restricted does not implicate a constitutional or statutory right.  While inmates have a First Amendment right to communicate with family and friends, they do not have a constitutional or statutory right to unlimited or unrestricted telephone access.  *Washington v Reno,* 35 F.3d 1093, 1100 (6th Cir. 1994); *Niece v Fitzner ("Niece I"),* 922 F.Supp. 1208, 1218 n. 8 (E.D. Mich. 1996).  Plaintiff's claim that the restriction was imposed based on false charges does not elevate his claim to a constitutional level.  Plaintiff has not stated a substantive due process violation under this standard.

The second type of substantive due process violation is "official misconduct, which although not infringing on a fundamental right, is so literally 'conscience shocking,' hence oppressive, as to rise to the level of a substantive due process violation."  *Howard v Grinage*, 82 F.3d 1343, 1349 (6th Cir. 1996).  There is no bright-line test for when conduct meets this standard; it depends on the facts of the case.  *Bowers v City of Flint*, 325 F.3d 758, 767 (6th 2003).  But, the Supreme Court has said that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience shocking level."  *County of Sacramento v Lewis*, 523 U.S. 833, 849 (1998).  The temporary restriction of Plaintiff's telephone privileges for an alleged violation of prison rules, even if such allegations were false as Plaintiff claims, cannot reasonably be characterized as conscience shocking.

Since Plaintiff has not stated a violation of his substantive due process rights, Count I will be dismissed.

**D.      NEITHER PARTY IS ENTITLED TO SUMMARY JUDGMENT ON**

18

**COUNT II**

In Count II, Plaintiff says that he attempted to use the TDD/TTY to contact an attorney and witnesses for his parole revocation hearing.  Therefore, he alleges that by denying him meaningful access to the TDD/TTY, Defendant prevented him from "exercising his [First Amendment] right of expression regarding his parole revocation hearing."  Amended Civil Complaint at p. 47.

In her Motion, Defendant asserts that she is entitled to summary judgment on the merits because there is no evidence that Plaintiff ever really attempted to contact an attorney.  In response, Plaintiff says that he was attempting to contact potential witnesses for his parole revocation hearing.  However, he argues that it does not matter why he was trying to make calls, because inmates have a First Amendment right to communicate with friends and family.

Plaintiff also moves for summary judgment on Count II.  Citing *American Manufacturers Mutual Insurance Co. v Sullivan,* 526 U.S. 40, 49-50 (1999)*,* Plaintiff argues that he is only required to prove that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."  He contends that he met this burden as a matter of law because Defendant violated his First Amendment rights by denying him reasonable access to the TDD/TTY, and because Defendant misused her authority as Case Manager to do so.  Defendant's only substantive argument in response is that Plaintiff's motion should be denied on Count II, as well as Counts III and IV, because he failed to show that her actions did not further a legitimate penological interest.

19

Both parties' motions are denied because there is a genuine issue of material fact.  As Plaintiff asserts, "persons incarcerated in penal institutions retain their First Amendment rights to communicate with family and friends."  *Washington,* 35 F.3d at 1100; *Niece I,* 922 F.Supp. at 1218 n. 8.  "'[T]here is no legitimate governmental purpose to be attained by not allowing reasonable access to the telephone, and . . . such use is protected by the First Amendment.'"  *Washington*, 35 F.3d at 1100 (*quoting Johnson v Galli*, 596 F.Supp. 135, 138 (D. Nev. 1984)).  Defendant presented some evidence that Plaintiff may not have actually attempted to contact an attorney during his stay at Egeler, but she does not dispute Plaintiff's assertion that he was attempting to contact witnesses for his parole revocation hearing.  In any event, Defendant does not conclusively refute Plaintiff's assertion that he was denied reasonable access to the TDD/TTY, regardless of who he was attempting to call.  Therefore, Defendant has failed to establish that she is entitled to summary judgment on this claim.

Plaintiff's motion will be denied because a question of fact remains regarding whether Defendant's policy of keeping the TDD/TTY in her locked office furthered a legitimate penological concern.  The Supreme Court has instructed that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  *Turner v Safely,* 482 U.S. 78, 89 (1987).  With regard to inmate telephone use specifically, the Sixth Circuit has likewise said that "a prisoner's right to telephone access is 'subject to rational limitations in the face of legitimate security interests of the penal institution.'"  *Washington*, 35 F.3d at 1100 (*quoting Strandberg v City of Helena,* 791 F.2d 744, 747 (9th Cir. 1986)).

20

The *Turner* Court directed district courts to consider four factors to assess whether a prison regulation is reasonably related to a legitimate penological interest: 1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; 2) whether there are alternative means of exercising an asserted right that remains open to prison inmates; 3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and 4) whether there are ready alternatives available that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests, which suggests that the regulation is an unreasonable "exaggerated response" to prison concerns.  482 U.S. at 89-91.  If the first factor is not met, the regulation is unconstitutional and the court need not consider the remaining factors.  *Spies v Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999).  The remaining factors are considerations that the court must balance together.  *Id.* However, "a trial court is not required to weigh evenly, or even consider explicitly, each of the four *Turner* factors."  *Id.*

Here, Defendant contends that each of the elements weighs in her favor.  She says that the prison practice of keeping the TDD/TTY in a locked office was necessary because it was connected to an unmonitored, unrecorded and unrestricted phone line.  Second, Defendant says that there is no alternative to the TDD/TTY to allow an impaired prisoner to use telephonic communication.  Third, Defendant says that having to accommodate Plaintiff would have required that one of the two officers assigned on Plaintiff's side of the housing unit (which housed 160 prisoners) leave those duties to

monitor Plaintiff's call.  She contends that this would have created a significant risk to
staff and other prisoners because only 15 officers would have been left to monitor the
other prisoners who were out of their cells at the same time going to the yard or dinner.
Also, Defendant says that she was responsible for approximately 150 case reviews and
keeping track of forms that needed to be completed and information that needed to be
collected in order to move prisoners through the reception process and on to more
permanent locations.  She says that "[i]t is a significant impact on available resources of
the housing unit to drop what other activities Defendant or the two officers on that side
of the cell block are doing in order to take a hearing impaired person to an office where
that person can use the TTY system."  Def. Reply at p. 6.  Fourth, Defendant says that
the regulation for using the TDD/TTY (*i.e.*, keeping it in a locked office) was not an
exaggerated response.  She says it was the only available way to provide some
telephonic communication to a hearing impaired prisoner in light of the security needs of
the prison.  Defendant says keeping the system locked and allowing access when staff
could be made available was quite reasonable.

Plaintiff first argues that the *Turner* factors do not apply in this case because
there is no prison regulation that governs Defendant's decision to lock the TDD/TTY in
her office and only allow access with her permission.  Plaintiff, however, does not cite
any authority which indicates that *Turner* only applies to regulations that are formally
adopted.  There is evidence that Defendant's practice was regularly enforced and at
least implicitly endorsed by her superiors.  Therefore, *Turner* applies.

Plaintiff contends that Defendant's actions did not further a legitimate penological

22

interest.  He disputes Defendant's contention that it was necessary to keep the TDD/TTY in a locked office.  In support, he attaches documents showing that TDD/TTY systems are available in a variety of models, including ones with monitoring and recording capabilities and which do not have to be affixed to an unrestricted phone line. Because these alternatives existed to allow him to use the TDD/TTY without requiring a dedicated staff member to monitor him, Plaintiff contends that Defendant's policy regarding access to the TDD/TTY was an exaggerated response to the alleged penological concerns and is evidence that it was unreasonable.  Furthermore, Plaintiff argues that the fact that it was inconvenient for Defendant to allow Plaintiff access was not a legitimate penological interest.

There is a question of fact regarding whether Defendant's policy of keeping the TDD/TTY system in her locked office with assess limited in the manner alleged served a legitimate penological interest.  For the first factor, there is no evidence to refute Defendant's claim that it was necessary to keep the device locked up because it was connected to an unmonitored and unrestricted telephone line.  However, there is a question of fact regarding whether the arbitrary means by which access was given served a legitimate governmental interest.  Defendant acknowledged that Plaintiff had to either contact her or, on weekends, a sergeant in order to use the TDD/TTY.   Def. Dep. at pp. 25-26.  However, Plaintiff testified that on several occasions Defendant did not make herself available for his requests because she would refuse to speak with him. Officer Moore, who sometimes relayed Plaintiff's requests to Defendant, testified that Defendant tried to accommodate Plaintiff but sometimes refused if she was busy or was

23

leaving.  Moore Dep. at p. 14.  Plaintiff and Officer Moore's testimony suggests that Plaintiff's requests were sometimes denied simply because it was inconvenient for Defendant to give him access, rather than because of security or staffing concerns. Reasonable jurors could differ regarding whether denials under these circumstances were justified by a legitimate governmental interest.

The remaining factors which are most relevant in this case are factors three and four.  There is a question of fact with regard to those factors as well.  For the third factor--the impact accommodation of Plaintiff would have on guards, other inmates, and resources--Defendant claims that accommodating Plaintiff during certain times created a security risk because one of two officers would have to leave his post.  However, Officer Moore testified that any staff member could monitor Plaintiff's calls and that most often Defendant, who was a case manager at the time, did so.  Moore Dep. at pp. 8-9, 14.  Therefore, there is a question of fact regarding the extent to which accommodating Plaintiff actually created staffing and security problems.

For the fourth factor -- whether there were ready alternatives -- Defendant again cites security concerns as a justification for keeping the device locked up, but does not address the random way in which permission to use the telephone was granted. Plaintiff contends that there are a number of different types of TDD/TTY systems that would not require supervision and could be installed in the same area with the regular telephones.  But, there is no evidence that Defendant, as a case manager, had the authority to install a more sophisticated telephone system for hearing impaired prisoners, or that the cost of those systems would have been *de minimis* for the MDOC.

24

However, in light of Officer Moore's testimony that any staff member could monitor Plaintiff's calls, jurors could find that there were viable scheduling alternatives to the sporadic procedures employed by Defendant that would have satisfied both Plaintiff's rights and Defendant's security concerns.

Both motions with respect to this claim are denied.

## E.    PLAINTIFF'S ADA AND RA CLAIMS MUST BE DISMISSED IN PART

Plaintiff alleges violation of Title II of the ADA[11] in Count III and violation of the RA[12] in Count IV.  He bases both claims on Defendant's failure to provide him with the same telephone access afforded hearing prisoners.  Defendant moves to dismiss both Counts alleging that they are barred by the Eleventh Amendment.  Defendant is partly correct.  For the reasons stated below, Plaintiff's ADA claim is dismissed in its entirety. However, his official capacity RA claim for monetary damages remains.

### i.    Individual Capacity ADA and RA Suits

Defendant is correct that neither the ADA nor the RA allows suits against government officials in their individual capacity.  *Goodwin v Caruso,* 2005 W.L. 1667391, *4 (W.D. Mich. 2005); *Key v Grayson,* 163 F. Supp. 2d 697, 715-716 (E.D.

---

[11]Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. §12132.

[12]Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. §794(a).

Mich. 2001); *Lee v Michigan Parole Board*, 104 Fed. Appx. 490, 493 (6th Cir. 2004)(unpub. op.).  Consequently, Plaintiff's individual capacity claims must be dismissed.

### ii.    Official Capacity ADA Claims for Money Damages

A Title II ADA claim against a government official in her official capacity for money damages is barred if it sounds in equal protection rather than due process. *Popovich v Cuyahoga County Court of Common Pleas,* 276 F.3d 808, 811 (6th Cir. 2002).[13]  In *Popovich*, a partially deaf litigant sued a state court's domestic relations

---

[13]*Popovich* is an extension of the Supreme Court's ruling in *Board of Trustees of the University of Alabama v Garrett*, 531 U.S. 356 (2001).  The Sixth Circuit succinctly summarizes *Garrett* and its relevance to *Popovich*:

> In *Garrett,* the Supreme Court held that states are immune to suits for money damages under Title I of the ADA.  The Court reasoned that ADA Title I, as enacted, exceeded Congress' constitutional authority to enforce the Equal Protection Clause of the Fourteenth Amendment, and as such was an invalid abrogation of states' Eleventh Amendment sovereign immunity.  *See* 531 U.S. at 374, 121 S.Ct. 955.  In order to be a valid exercise of this enforcement authority, legislation must respond to a documented "history and pattern of unconstitutional ... discrimination by the States," and must on balance be congruent and proportional to the scope of the right it enforces.  *Id.* at 365, 121 S.Ct. 955.  The Court explained that because disability is not a suspect class, the Equal Protection Clause allows states to make distinctions in employment on the basis of disability so long as they are rationally related to a legitimate state purpose.  *See id.* at 365-68, 121 S.Ct. 955.  As a corollary to this principle, "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational."  *Id.* at 367, 121 S.Ct. 955.  Accordingly, the Court concluded that ADA Title I, which categorically requires such accommodations without regard to the existence of a rational basis for discrimination, was overbroad and disproportional to the scope of Equal Protection guarantees.  *See id.* at 372-74, 121 S.Ct. 955.  However, it specifically declined to

26

division, alleging that the court violated the ADA by failing to provide him with adequate accommodations so that he could participate in custody proceedings.  The *Popovich* Court found that plaintiff's claim sounded in due process because his claim was that the state court, in failing to accommodate him, denied him a reasonable way to participate meaningfully in the custody proceedings, effectively excluding him from the proceedings.

Conversely, in *Carten v Kent State University*, 282 F.3d 391 (6th Cir. 2002), the Sixth Circuit found that the ADA claim of a graduate student who was dismissed for poor academic performance sounded in equal protection.  The Court so held because plaintiff only complained that he was denied access to public education; he did not allege that he was denied an opportunity to participate in judicial proceedings or adequate process in his dismissal.

The Sixth Circuit held similarly in *Robinson v University of Akron School of Law*, 307 F.3d 409 (6th Cir. 2002).  In *Robinson*, plaintiff was a law student.  After his first year he complained to the University dean that he had difficulty reading.  Plaintiff was tested by a University doctor and diagnosed with a learning disability that affected his reading speed.  Plaintiff also suffered from Attention Deficit Disorder.  Because of his

---

address ADA Title II, which prohibits states from discriminating against the disabled in the provision of public services, reasoning that Title II "has somewhat different remedial provisions." *Id.* at 360 n.1, 121 S.Ct. 955.

*Robinson v University of Akron School of Law*, 307 F.3d 409, 412 (6th Cir. 2002)(footnotes omitted).

disabilities, plaintiff requested that the University give him either unlimited or 100% additional time to complete exams.  The University only agreed to give him an additional 25%.

Plaintiff protested the decision and eventually withdrew from the school.  He then sued the University, alleging that it failed to accommodate his disability in violation of Title II of the ADA and the RA.  The University moved to dismiss on the basis of Eleventh Amendment immunity.  The district court denied the motion and the University appealed.  While the appeal was pending, the Sixth Circuit decided *Popovich*.  Citing *Carten*, Plaintiff argued that his claim sounded in due process rather than equal protection because he was not given the opportunity to appear at any of the proceedings where the University employees chose the accommodation that he was offered.  The *Robinson* Court disagreed stating:

> The essential holding of *Popovich* is that a Title II claim sounds in due process and abrogates sovereign immunity where the plaintiff alleges that he was excluded from participating in a proceeding guaranteed to him by the Due Process Clause on the basis of his disability.

307 F.3d at 413.  The Court pointed out that even though plaintiff claimed he was barred from the hearings in his case, he did not allege that he was excluded because of his disability.  Rather, the Court stated that plaintiff's only viable ADA claim was that he was denied access to public education on the basis of his learning disability.  This claim, the Court said, "is essentially one that he was treated differently from other, non-disabled individuals, and sounds in equal protection, as *Carten* makes clear."  *Id*.  The Court further held that "an alleged denial of due process not predicated on the plaintiff's

28

disability may [not] be joined to a standard, equal protection-style ADA claim to defeat sovereign immunity." *Id.*

Despite Plaintiff Tanney's protestations to the contrary, his claim is analogous to those in *Carten* and *Robinson*.  The essence of Plaintiff's claim is that he was denied access to the TDD/TTY that was comparable to that afforded hearing prisoners who used the traditional phone system.  Simply put, he claims that he was treated differently (and less favorably) than hearing prisoners because of his disability.  This is a classic equal protection claim.  Although Plaintiff also alleges that Defendant revoked his privileges, via the NOI, without the benefit of a hearing, it is undisputed that the MDOC Policy Directive gave MDOC officials 14 days to hold a hearing and that Plaintiff's hearing ultimately was not held because he transferred from the 2 Block before the time elapsed.  There is no evidence that Plaintiff was denied a hearing because of his disability.  As in *Robinson*, the basis of the only ADA claim Plaintiff asserts sounds in equal protection.  Consequently, Defendant's motion to dismiss Plaintiff's official capacity claim for money damages under the ADA is granted.

### iii.   Official Capacity ADA Claim for Injunctive and Declaratory Relief

Claims against a government official under the ADA in her official capacity for prospective declaratory or injunctive relief are not barred by the Eleventh Amendment. *Carten,* 282 F.3d at 395; *Doe v Wigginton*, 21 F.3d 733, 737 (6th Cir. 1994)*; Akella v Michigan Dept. of State Police,* 67 F.Supp.2d 716, 722 (E.D.Mich. Aug 10, 1999); *Uttilla v Tennessee Highway Dept.*, 208 F.3d 216 (6th Cir. 2000)(unpub. op.).  The rationale is that an official capacity claim for prospective relief to end a continuing violation of

29

federal law is not considered a claim against the state and, therefore, is not barred by the Eleventh Amendment. *Wigginton*, 21 F.3d at 737.

Plaintiff concedes that his claim for injunctive relief is moot, because of his transfer to a different facility, and the Court finds that his claim for declaratory relief is also moot. Defendant's motion to dismiss is, therefore, granted.

### iv. Official Capacity RA Claims

Claims may be brought under the RA against government officials in their official capacity. It is settled that states waive their Eleventh Amendment immunity when they accept federal funds. *See Gean v Hattaway,* 330 F.3d 758, 775 (6th Cir. 2003); *Nihiser v Ohio EPA*, 269 F.3d 626, 628 (6th Cir. 2001). Consequently, defendants acting in their official capacities on behalf of states that have waived immunity are acting as the state and are not immune from suit. *Gean,* 330 F.3d at 775. Here, it is undisputed that MDOC accepts federal funds. Therefore, Defendant is not immune from liability in her official capacity under the RA. *See Key v Grayson,* 163 F.Supp. 2d 697, 714 (E.D. Mich. 2001). Defendant's motion to dismiss this claim is denied as to Plaintiff's claim for monetary damages. However, Defendant's motion is granted with regard to Plaintiff's claims for injunctive and declaratory relief because those claims are moot.

### F. NEITHER PARTY IS ENTITLED TO SUMMARY JUDGMENT ON COUNT IV

Each party contends that undisputed facts warrant summary judgment in their favor on the RA claim (Count IV).

To state a *prima facie* case under the RA, a plaintiff must show:

> (1) The plaintiff is a "handicapped person" under the Act; (2) The plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his handicap; and (4) The relevant program or activity is receiving Federal financial assistance.

*Maddox v University of Tenn.,* 62 F.3d 843,846 (6th Cir. 1995).

Although intentional discrimination is not an element of a *prima facie* case, a plaintiff must prove intentional discrimination in order to obtain compensatory damages. *Powers v MJB Acquisition Corp.,* 184 F.3d 1147, 1152-1153 (10th Cir. 1999). Intentional discrimination "can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." *Powers*, 184 F.3d at 1153. "'Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that likelihood.'" *Kennington v Cottey,* 2004 W.L. 2137652, *7 (S.D. Ind. 2004).[14]   Therefore, there are two standards for deliberate indifference: 1) notice that an accommodation is required, and 2) failure to act that is a result of conduct that is more than negligent and involves an element of deliberateness.  *Id*.

There is no dispute in this case that the first, second and fourth elements of a *prima facie* case are met.  Because Plaintiff is deaf he is considered to be a

---

[14]Although *Kennington* involved an ADA claim, ADA and RA claims are analyzed under the same standard because the ADA is modeled after the RA.  *McPherson v Michigan High School Athletic Assoc., Inc.,* 119 F.3d 453, 460 (6th Cir. 1997); *Hamlyn v Rock Island County Metropolitan Mass Transit District,* 986 F.Supp. 1126, 1132 (C.D. Ill. 1997).  Also, "[b]ecause the standards under both of the acts are largely the same, cases construing one statute are instructive in construing the other."  *McPherson*, 119 F.3d at 460 (citation and quotation marks omitted).

handicapped person within the meaning of the RA.  The MDOC provides phone service to inmates.  Therefore, as an inmate, Plaintiff was qualified to utilize that service.  And, Defendant does not dispute that the MDOC receives federal funding.

Plaintiff contends that the third factor is also satisfied because it is undisputed that, through April 12, Defendant failed to provide him access to the TDD/TTY system that was comparable to that afforded hearing prisoners, and that he was denied access entirely after April 13.  Lastly, Plaintiff asserts that the Court can infer from Defendant's deliberate indifference that her discriminatory actions were intentional.  Specifically, Plaintiff asserts that Defendant knew that he was deaf and, therefore, knew that he required an accommodation.  He contends that the deliberate nature of Plaintiff's actions are evidenced by several factors: 1) the absence of specific procedures for using the TDD/TTY, which required him to beg or pester staff members, and limited his access to staff availability; 2) while consulting others about revoking his privileges, Defendant ignored his requests to use the TDD/TTY; 3) the fact that Plaintiff's use of the TDD/TTY over a weekend without Defendant's permission was a factor in her decision to revoke his phone privileges, even though hearing prisoners were allowed to use the phone on weekends; and 4) she revoked his privileges entirely based on a policy of which he was not aware and which hearing prisoners could not violate because their phone system automatically blocked cell phone calls.

Defendant does not explicitly address the RA elements or whether her actions amounted to intentional discrimination.  And, the only assertions that she makes are not supported by the record.  For instance, Defendant asserts that Plaintiff has not

32

presented evidence that she ever denied his request to use the phone. While this may literally be correct, there is evidence that: 1) Defendant kept the TDD/TTY locked in her office, 2) she did not make it accessible when she was not there, 3) she did not establish procedures for when Plaintiff could use it, 4) according to Plaintiff, she did not make herself accessible for requests, and 5) in her email to Denman, Defendant referred to Plaintiff's use over the weekend as "unauthorized," which suggests that Plaintiff was not permitted to use the TDD/TTY without her express permission. Therefore, while Defendant may not have directly denied any of Plaintiff's requests, there is unrefuted evidence that she effectively did so in myriad ways.

Defendant's second factual assertion is that Plaintiff's access to the TDD/TTY was not fundamentally different than that of hearing prisoners, when one considers the number of hearing prisoners (160) relative to the number of phones available to them (16). In support of this assertion, Defendant cites the testimony of Officer Moore. In response to a question regarding whether Plaintiff had access to the phones that was equivalent to that of hearing prisoners, Moore said "I would think in comparison with the general population, he probably used it more. I mean there -- we do have a few guys that use the phone a lot; but for the most case, guys don't even use it once a week." Moore Dep. at p. 26. Moore qualified this response, however, when questioned by Plaintiff's counsel:

> Q:   Now, Mr. Moore, you just told us that Mr. Tanney probably actually had more access to the phone than the average prisoner. Could you -- how much access did he have, I would say compared to a hearing prisoner who tried to use the phone all the time?

33

A:      Oh, in that case, he would have -- he didn't have as much access because that -- it was a different circumstance. Somebody would have to be with him, right with him, instead of the general population, we didn't have to be right there with them.  Like I said, there are a few guys that use the phone almost every day.

* * *

Q:      So what -- and I want to make sure this is correct.  So, if a hearing prisoner wanted to use the phone a lot, let's say every day, would they typically be given -- be able to sign up to use the phone, either the house phone or get access to the yard phone, every day or almost every day?

A:      Almost.  If the phone list wasn't already filled up.  Because, like I said, there's only -- we only have 12 slots in the morning. So if they were one of the first people to come down and sign up, they could -- they could use the phone every day if they signed up . . . .

Q:      Does the phone list always fill up?

A:      Not always.

* * *

A:      Evening times it usually does; but in the morning times, we usually -- we might have a couple slots left over.

Q:      And you mentioned that prisoners are allowed to use the phone during yard time.  Was Gene Tanney able to use the phone during yard time?

A:      It would depend on if he could catch the -- like a counselor or a sergeant or something to give him access to the phone.

* * *

A:      I mean, obviously not as much as prisoners that were able to go outside and use the phone.

*Id* at 27-28.  Contrary to Defendant's claim, Moore's testimony suggests that Plaintiff's

access to the TDD/TTY was more limited than a hearing prisoner's access to the regular telephones.

Nevertheless, Defendant contends that, under *Turner*, she had a legitimate penological interest for maintaining the TDD/TTY in her office and limiting Plaintiff's access based on staff availability.  Citing *Niece v Fitzner ("Niece II")*, 941 F.Supp. 1497 (E.D. Mich. 1996), Plaintiff asserts that the *Turner* factors do not apply to RA claims. The Court finds that both Plaintiff and Defendant's arguments fail.

Plaintiff interprets *Niece II* as holding that an assessment of the reasonableness of penological interests is already included in the standards for RA claims and, therefore, it is not necessary to apply the *Turner* factors to such claims.  There is no support for Plaintiff's broad reading of *Niece II*.  The issue before the *Niece II* Court was whether the ADA and RA apply to state prisons.  In its analysis, the Court considered the states' interest in maintenance of state penal institutions, which federal courts typically accord strong deference.  One state issue was the extent to which the ADA and RA would impact prison security concerns.  The Court noted that, under the ADA and RA, an individual may be entitled to a reasonable modification of a particular service or program.  But, the Court asserted that what is "reasonable" would take into account the nature of the modification sought and the circumstances under which it is sought.  Therefore, modifications which would jeopardize the security of other inmates or prison officials would not be considered reasonable.  It is presumably this language that Plaintiff relies upon for the proposition that a separate reasonableness assessment is not necessary for RA claims.  In fact, however, the *Niece II* Court merely found that

35

"[t]he policy concerns inherent in the maintenance of state correctional facilities, such as security, discipline and rehabilitation, will not be frustrated by application of either [the RA] or the ADA to state prisons."  941 F.Supp. at 1511.

Moreover, other courts have applied the *Turner* factors to ADA and RA claims.[15] *See Gates v Rowland,* 39 F.3d 1439, 1447 (9th Cir. 1994)(applying *Turner* to RA claim); *Brown v King County Department of Adult Corrections*, 1998 W.L. 1120381, *7 (W.D. Wash. 1998)(applying *Turner* to ADA claim).  In *Gates,* the Court reasoned that:

> There is no indication that Congress intended the [RA] to apply to prison facilities irrespective of the considerations of the reasonable requirements of effective prison administration. It is highly doubtful that Congress intended a more stringent application of the prisoners' statutory rights created by the [RA] than it would the prisoners' constitutional rights. Thus, we deem the applicable standard for the review of the [RA's] statutory rights in a prison setting to be equivalent to the review of constitutional rights in a prison setting, as outlined by the Supreme Court in [*Turner*].

39 F.3d at 1447.

Defendant's claim that she had a legitimate penological interest fails for the reasons stated above on Count II.  There is a question of fact as to whether Defendant had a legitimate penological interest in limiting Plaintiff's access in the manner that she did.

The parties' respective motions for summary judgment are denied.

## VII.   CONCLUSION

---

[15]As noted in footnote 14, cases involving ADA claims are instructive in the analysis of RA claims.  *McPherson*, 119 F.3d at 460.

36

Plaintiff will be allowed to amend his complaint to state the capacities Defendant is sued under and the relief requested.  Plaintiff and Defendant's respective Motions for Summary Judgment are **DENIED**.  Defendant's Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**:

1.      Defendant's Motion to Dismiss Count I (due process) is **GRANTED**.

2.      Defendant's Motion to Dismiss Count II (free speech) against her in her official capacity for monetary, injunctive and declaratory relief is **GRANTED**, but the motion to dismiss this claim against Defendant in her individual capacity is **DENIED**; trial will go forward on Plaintiff's claim against Defendant in her individu al capacity for monetary damages.

3.      Defendant's Motion to Dismiss Count III (ADA) is **GRANTED**.

4.      Defendant's Motion to Dismiss Count IV (RA) against her in her individual capacity and in her official capacity for injunctive and declaratory relief is **GRANTED**, but the Motion to Dismiss the claim in her official capacity for monetary damages is **DENIED**.  Trial will go forward on Plaintiff's claim against Defendant in her official capacity for monetary damages.

**IT IS SO ORDERED.**

**s/Victoria A. Roberts**
**Victoria A. Roberts**
**United States District Judge**

**Dated:  December 1, 2005**

**The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on December 1, 2005.**

**s/Linda Vertriest**

**Deputy Clerk**